Good morning, Your Honor. Timothy Coates on behalf of the City of Santa Maria, the Santa Maria Police Department, and Andrew Bryce. We've had the benefit of an opening and a reply brief, 28J letter. I think the case is fairly straightforward. It's been a long calendar. I submit the law has gotten better for the defendants on the clearly established law prong of qualified immunity. The Supreme Court's decision, White v. Polly, which has continued that steady drumbeat of having a case with very specific pertinent facts in order to deny qualified immunity to an officer. Post-White, this court has applied that standard with, I think, some bite in the SB case, the Schaefer v. County of Santa Barbara case, the Itzaeva case. And I think we just do not have case law cited here by the plaintiff that would put a reasonable officer on notice at the time, specifically Officer Bryce, that he was being deliberately indifferent to the needs of the plaintiff. And you're using the former standard? The former standard. He's entitled to that. My one question about this is that there's something said in passing in the plaintiff's brief that I was thinking about. The point of qualified immunity is that people should know whether what they're doing is unconstitutional. When you start dealing with a mental state question, it gets fairly bizarre. In other words, what he should have known was that he could do this as long as he wasn't deliberately, as long as he didn't actually know about the danger. So he could do it because he didn't know about the danger, but now he didn't have to know about the danger. He just had to be reasonable. But is that really going to influence anybody's behavior? The question is, what did he do? Well, I think he has to, under the former standard, which was essentially Farmer v. Brennan, the Eighth Amendment standard, has to have an actual belief that someone is suicidal in order to have a right that he had to act on. And so that's not the case here. Says to himself, I'm in the phone with the mother, and the mother says, I mean, according to the mother, not him, you know, that he's, I mean, I'm fearful he might take his life or something to that effect. Two weeks earlier he had made statements to that effect, yes. And, you know, you have to really watch him closely or something to that effect. And so then he gets off the phone and he says, well, should I go right over there or should I go do my paperwork first? Well, I don't really know for sure whether he's really dangerous, so therefore I can go do my paperwork. Well, the standard was. It's a bit of a strange. No, I don't think so. Not under the governing law at the time. In the Kahn case, which is a good example where the court denied qualified immunity because the officers had actual knowledge this person was trying to commit suicide and was actively suicidal. That's the case right in the back of the paddy wagon. I'm not sure you're hearing what I'm saying. I understand the difference in standards. No. I'm questioning how that interacts with qualified immunity. Well, under the. The standard, unlike most standards, is a standard about a mental state, not a standard about what you can do or don't do exactly. Well, I would differ with the court on that. I mean, it's the officer has to look. It's an objective inquiry. If the officer surveying the law would be put on notice that the particular conduct that he was engaging in is causing a constitutional violation. And Officer Bryce may well, if someone had been actively suicidal, as you had in the Kahn case, if the person had voiced clear suicidal ideation, had in fact attempted suicide. Remember, again, Kahn, the person wraps the seat belt around their neck in the back of the paddy wagon. When they extricate the person, they say, kill me or I'm going to kill myself. Then the officers don't tell anyone about that. That's the state of the law that was governing Officer Bryce's conduct. And that would certainly not tell him that highly equivocal statements from a mother that two weeks earlier, my son was acting possibly in a way that's self-harm, was taken away, seen by medical professionals, who then determined that he was not a risk, a suicidal risk, and released him, didn't hold him on 5150, that that somehow compelled him to act immediately to run back and check on him. Under the current standard, as I understand. I'm sorry? You would say the same thing under the current standard, I gather. I would. I would. I think that even under Castro that we just. . . That's the point, because the standard, the mental state is not really governing anything. Well, it's the objective state of the law. That's what I'm saying is the officer would have to know that equivocal statements would be sufficient under the laws that existed then to subject him to liability. And I know why a plaintiff wants to shift that and say, look at Castro, look at post-law. The trouble they have is, and the Supreme Court has repeatedly said this, from Anderson v. Creighton at the very outset of this clearly established law inquiry, to White v. Polly, to the Wesby case that was only issued a few weeks ago, that you look at the law at the time the violation occurred. Do any of those cases deal with a shift in the mental health, mental state? Not the action, but the mental state? It deals with what the law. . . I'm asking you, if any of the cases you're talking about deal with that kind of a change in the law? No, but I don't believe it's relevant to the qualified immunity inquiry. All right. Do you want to go on to the municipal liability questions? Municipal liability questions? Our view is that if the Court goes to the second prong of qualified immunity, namely whether in effect there's a constitutional violation at all, that applying, whether you pre-Castro, certainly pre-Castro, there is no subjective knowledge or subjective belief that he's suicidal. Well, what first of all, we don't need to do that to decide the qualified. . . Correct. That is correct. Under Pearson, that's the Court's choice. So why do we have jurisdiction on the municipal liability question? You can under the. . . I know we can, but suppose we don't. If you don't reach that issue, then you don't reach the municipal liability issue. That's the Pointe v. Arparo case. And we reamend it. It goes back. It goes back. That's right. If it's just done on clearly established law, the case law is clear on that. It's only when the Court goes to the other prong, what used to be the first prong. . . We believe that. If the Court reaches the merits argument, yes. All right. Okay. So first you agree that if we don't reach the merits issue, we don't get to the municipal liability. Correct. That's the case law. All right. Second of all, if we do get to the substantive standard, current substantive standard, and conclude that he did have a constitutional error, but there is qualified immunity because he didn't have. . . Because of the prior. . . The clearly established law prong. Why isn't there still not jurisdiction over the municipal liability? In other words, I don't understand why if Bryce. . . Well, first of all, if we concluded that Bryce did commit a constitutional wrong, then what? Then we would say that there is municipal liability or we wouldn't decide it? You wouldn't decide it because there would be an issue of fact. I mean, we wouldn't be able to get judgment as a matter of law, but even the trial court didn't grant a cross motion for summary judgment to the plaintiff. So the only way you get what you. . . And moreover, there are other possibilities as to what the municipality might be liable for, other than Bryce's own behavior. I think under the Court's case law, no, because the other individual defendants got out on summary judgment not based upon absence of clearly established law, but on the merits. It's an odd situation. I will acknowledge that. But they did not get out on absence of clearly established law. They got out on the merits. But there's also. . . I suppose there are other possibilities with regard to failure to train and so on. Well, not without an underlying constitutional violation by someone. I mean, that's the city of Canton v. Harris case. We cite that in our reply brief. This Court's decision in Quintanilla v. City of Downey. Somebody has to commit a constitutional violation. Somebody has to be deliberately indifferent. Are you admitting the constitutional violation under the current standard for purposes of municipal liability? I think that may be true. That may be true because the qualified immunity standard extends to the officers, the state of the law. That's correct. All right. That's correct. And then what about the state immunity question? I think the state immunity question should be resolved in favor of the defendants as well, because I think it's so closely tailored to what we're talking about in terms of the obvious danger or risk to Mr. Horton that the officer was aware of here is not. . . I mean, it's just not obvious. It's at most equivocal information that Officer Bryce had. When you talk about ignoring a serious medical need, it's a requirement for imminent intervention and medical intervention. I think we cite the Lucas case, which reversed a jury verdict on the fact that the officer didn't have sufficient knowledge that the person in jail was going to commit suicide, that a general knowledge that he was drunk and possibly incapacitated wasn't enough to say, you've got to find a doctor immediately and you've got to do something. And I think we have the same situation here. All Officer Bryce has in the way of information, he said that he thought that Mr. Horton was acting a little calm, but he said, I didn't think he was mentally disturbed. And then he had the conversation with the mother, and again, as we assert. . . Isn't that all a factual question? No, I don't believe so. I think what his mother was telling him is not a factual question. I think we state her own testimony that she said two weeks earlier he was taken in and mental professionals ultimately held that he was not a risk to himself, that he was not suicidal. I don't think under existing case law that that tells an officer that this person is in need of imminent medical intervention. It just doesn't. And I don't think there's analogous case law that they have cited under the California statute that would support liability here. I mean, it's also true that he apparently had talked to the original officer in a way that made that person concerned. No, I don't think so. I don't believe that that's the record here either. Well, Officer Snyder spent some time talking to him. Spent some time talking to him. In the holding cell. That's right. Bryce is the one who picks him up, is that correct, at the house? Yes, Bryce picks him up. Schneider takes him back. Bryce then comes back. They both speak to him. But even the other information given isn't enough to say there's an imminent need for medical care or medical intervention. This just isn't an obvious suicide type case. That's why I think it's closer to Lucas than to anything else. And also, of course, we have the separate immunities under California law that recognizes that there's immunity for failure to diagnose mental illness or to confine someone or to have specific terms of confinement for mental illness. And part of that's because California law recognizes just how difficult these types of determinations are. And so I would submit that under the governing law and the statutes, there's no liability under 845.6 either. If the Court has any further questions. Thank you very much. You have some time. Thank you. May it please the Court, Martin Buchanan appearing for Shane Horton. I'd like to begin, if I could, with a question of the Court's jurisdiction over the Monell claims against the municipality. The general rule in this circuit under Swint is that a court cannot bootstrap jurisdiction over a premature Monell appeal onto a proper qualified immunity appeal brought by the individual defendant. We just got that concession and we also got the concession that if we don't reach the constitutionality issue, that the case has to go back. Well, but even if the Court does reach the constitutionality issue, the fact that individual defendants may not have committed any constitutional violation does not mean that the municipality is free of liability. And the case law is very clear that a municipality itself can be a person for purposes of liability under section. In general, how is it true in the facts of this case? Well, we have several theories of liability against the municipality for its own customs and practices that are independent of any liability by. There's no liability for any officer in this case. It suggests that you don't have standing. I disagree, Your Honor. We have standing to sue the municipality for its unlawful customs and practices that are the moving force behind the constitutional violation. There's a constitutional violation. But if no officer has been found to have violated the constitution, so that's a big step here. That's different from qualified immunity. But if no officer has violated the constitution, how is it that you get to go against the city for violating constitutional rights? Well, Your Honor, because the case law in the Ninth Circuit holds that you don't need any liability of an individual officer to hold liability. But you need a constitutional violation. You need a constitutional violation which can be brought about as a result of the municipality's conduct, independent of any liability. Give me an example of how that operates. Well, I guess the best I could do for you is, for example, on our failure to train theory of liability, the district court denied summary judgment on our theory of liability against the municipalities for failure to adequately train in suicide detection and prevention. And that means that somebody, you didn't train your people to do things constitutionally, so somebody did something unconstitutional. Well, no, Your Honor. If nobody did anything unconstitutional, then why is the municipality liable, even if they could have done better training? I mean, there's an issue about the belt, for example. Right. Apparently you had a rule that they were supposed to take the belt, but in practice they didn't take off the belt, and they should have been telling people to take off the belt. Right. Okay. But if nobody, if in not taking off the belt nobody committed a constitutional violation, then how can the municipality be liable for not training people or making sure that people were taking off the belt? Your Honor, I think that question is directly addressed in Fairley v. Luman on page 917, where the court talks about city of Canton liability for failure to train and specifically says the Supreme Court recognized that a city could be held independently liable even though no individual defendants were sued, and then goes on to say. Of course, it has to do with suit. No, no, Your Honor. You still have to find a constitutional violation. It goes on to say, quote, even more to the point in Hopkins v. Endaia, citation, we held that a city could be liable under section 1983 for improper training or improper procedure even if the individual officer charged with violating the plaintiff's constitutional rights was exonerated. And I think this is consistent with Your Honor's decision in Gibson where you set out the two different routes to liability under Monell. One of those routes, yes, indeed, does require an individual defendant to have violated the plaintiff's constitutional rights. But the other route, and the court made this very clear in footnote 7 of your opinion in Gibson, does not require any particular violation or commission of a constitutional violation by an individual. It's the municipality's policies, practices, or procedures themselves that give rise to the constitutional violation. So if the municipality failed to train these officers adequately to detect suicide risks, the municipality can be liable for that, even though the inadequately trained officers themselves did not violate any... At what point, then, would the court make an inquiry about the Constitution? Otherwise, Monell has just become sort of a general tort liability. Well, I think that's answered... If you could have a negligent failure to train, that would be tort liability, but it wouldn't be a constitutional violation. Right. It's a higher standard than negligence. I don't dispute that, Your Honor. I think... This is the problem. And I, unfortunately, don't have Gibson here, but I don't know if I did. If you still have to demonstrate in some way that the person's constitutional rights were violated, right? By the municipal practice, yes. Because something happened to him that shouldn't have happened to him. Correct. So what is the constitutional violation? The constitutional... The failure to train... It has to be a failure to train somebody not to do something that's unconstitutional. Well, the basic constitutional... Do something that is constitutional. Yes. The basic constitutional right, of course, is the 14th Amendment right to adequate care for serious medical needs, which under this Court's precedence includes a heightened risk of suicide. And so the municipality's policies gave rise to a violation of that constitutional right, because in order to safeguard that right, you've got to train people in suicide detection and prevention. But it's almost like a causation issue. If there's no constitutional injury, then even assuming horrible policies by the municipality, what's the injury to the... What's the constitutional injury that occurred to the plaintiff? The constitutional injury is the injury that occurred as a result of the municipality's policies that exhibit essentially deliberate indifference. Take the belt, okay? Sure. They didn't train people that they really have to take these belts off. Right. All right. Somebody then doesn't take the belt off. Right. If that person not taking the belt off, I don't know why, but apparently it wasn't a constitutional violation. You didn't appeal that. We don't have any right to appeal at all at this point. All we have is an interlocutory appeal on qualified immunity. Well, is that the answer maybe, that you still may be appealing these determinations with regard to all these individuals who were held not liable, and therefore we can't assume the propriety of those decisions, and they may in fact turn out to be a problem? Well, I think that is true. And in fact, if you look at the decision, the basis for that decision has been completely undermined by Castro. What the district court held is those individual defendants, including Officer Schneider, were not entitled to qualified immunity, but . . . And those weren't appealable because they weren't a part of a final decision. Because of what, Your Honor? There was no final judgment. Correct. We can't appeal anything at this point. You still have the right to appeal the dismissal of Officer Schneider, for example. Right. And with respect to that, the court found insufficient evidence of deliberate indifference to medical needs. Well, we now know . . . I mean, that was the correct standard at the time of the court's judgment, but it's no longer the correct standard under Castro. So, in fact, there may be people who are liable. There may be other people besides Officer Bryce. Therefore, there isn't a complete overlap. So, therefore, there is not a complete overlap between municipal liability and the qualified immunity appeal. This was a useful conversation. I'm glad it was helpful. It took a while to get there. Yes. Just briefly, the other . . . We really have three related municipal customs and policies that we're relying on. One is the failure to train on suicide detection and prevention, which the court denied summary judgment on. The other is the failure to develop written policies and procedures to identify and evaluate all mentally disordered inmates as required under the California regulation. The court also denied summary judgment on that claim. That's California law, right? That's California. That's a California law, correct. And the third, and these are all related to one another, and the third is the actual pervasive and widespread custom and practice of not removing belts from inmates before placing them in temporary holding cells. Now, the court granted summary judgment on that to the extent it was based on a policy of giving officers discretion. But, in fact, what we're alleging is that it was a pervasive practice of simply not putting belts on. So those are the . . . Just to be clear, I don't think we were as clear as we could have been in our briefing about what exactly the municipal policies are that we contend impose liability against the municipalities regardless of any constitutional violation by the individual defendants. Not regardless. You see, that's where you're getting confused or confusing us. It's not regardless. It's that that hasn't been determined definitively yet in this lawsuit. It's not regardless. I'm making that argument as well, Your Honor, but I'm also making the regardless argument. I think if you look at fairly, and I know Gibson is your opinion. There's no reason that you need to prevail today on that argument. Schneider, you didn't have an opportunity to appeal the dismissal of Officer Schneider. True, correct. That is sufficient to preserve your claim, your Monell claim. All right. So you can make that argument to the district court later on. All right. And then if you lose there, then you can come back to us. Yes.  So in my . . . Why don't you tell us about Officer Horton? Yes. Officer Bryce? I'm sorry, Officer Bryce. Yes. I'm sorry. Yeah, so the question is whether the contours of this right were sufficiently well established that a reasonable officer in Officer Bryce's position would have understood that he was violating Mr. Horton's constitutional rights. And the contours of this right were fairly well established in Kahn. Of course, every case is factually different. But in terms of the governing principles, Kahn first identified a heightened suicide risk as a serious medical need within the meaning of the 14th Amendment. That was a failure to warn case. That's a Tarasoff warning problem. I don't see it as a failure to warn case. It was a failure to tell people that they were releasing him back into the public. It wasn't a failure to say he is in imminent danger because it was days later that he did so. It wasn't imminent. Right. But I think in terms of the governing principles, the court says . . . The court establishes the criteria for a violation of this right, that there has to be a serious medical need, and at that time, a deliberate indifference, which the court defines as an awareness of the risk and a failure to adequately respond, and then finally, causation. Okay. So what is the awareness of the risk? What risk was Officer Bryce supposed to know about? Well, here's all the information that Officer Bryce was aware of. Number one, Officer Bryce himself testified that he believed Mr. Horton's behavior wasn't normal at the scene. Number two, he had spoken to Mr. Horton's girlfriend who had . . . Normal is not the same as a suicide risk. Well, this is a totality. I'm giving you all the . . . I realize no one piece of evidence is sufficient, but I'm giving you the totality. Number two, Officer Bryce had spoken to Horton's girlfriend. She had told him that he had been behaving bizarrely and making strange statements. Now, that was not just that morning, but over a period of some time, is that correct? I think she did say it had been recently. I could be wrong about that. Because Horton was seated at a computer table in the garage when they pulled the garage up, and he is calm, addresses the officer's questions, was polite. Yeah. In fact, Officer Bryce said he was strangely calm, and it caused him to wonder about his mental state to some extent. But that wouldn't tell you that he was suicidal. Not yet. So let me continue, and I think we'll get there. I'm giving you the totality. Again, in the conversation in the interview room that Officer Bryce had with Mr. Horton, Officer Bryce formed the impression that there may be mental issues going on and also that Horton's view of reality may be skewed. That's Officer Bryce's testimony. And then finally, this is the most important, of course, is the information that Mrs. Horton stated to Officer Bryce. And there we have a conflict in the evidence, but we have to accept her. But there's nothing that she says that says my son is a threat to himself right now. And especially we know that because Officer Bryce was listening to the conversation from Horton's side. He's outside the cell while Horton is on the phone with his mother. He can't hear what the mother says. No, no, I'm talking about Officer Bryce's subsequent conversation with the mother. That's right, but she doesn't tell him anything about Horton's immediate mental state. Oh, I think she does. Officer Bryce doesn't know because she can tell him what happened two weeks ago, but being suicidal two weeks ago does not mean he's imminently suicidal. Well, she says, I told Officer Bryce I thought he was suicidal, that he was suffering from depression, that he hadn't been himself. He had trouble with depression. He was really worried that something else was going to happen. And that just two weeks earlier he held a knife. All of those are good reasons that you'd want to get him in to see a doctor. But it doesn't suggest that at the very moment that we are on this telephone conversation that he is over attempting to take his life. Well, I think when you add to that the fact that she did tell him that only two weeks earlier he'd held a knife to his throat, he'd tried to cut his wrist, broke a window, tried to cut his wrist with the glass. That's not imminence. Well, I think when you put it together with the entire picture, it at least gives enough cause for... There was nothing in his conversation with her, that is, Horton's conversation with his mother, that suggested that you're... For example, he didn't say either come and bail me out or I'm going to cut my wrist. No, he didn't say that. But, I mean, you could say the same thing about the Kahn case. The officers in that case... In the Kahn case, he doesn't kill himself for a couple of days. It was a failure to let his family know that they were releasing him so that they could get the medical care that he needed. Well, I think... He doesn't take his life for a couple of days. It wasn't imminent. It turned out to be eventual, but it wasn't imminent. Right, it wasn't imminent. But the court still held that even though it wasn't imminent, that the transporting doctor... So that would have told... If Bryce had read Kahn, that would have told him that he shouldn't have released Horton without advising his family that he was releasing him. I mean, that's the principle that comes out of it. Well, I don't... I mean, I thought that the holding in Kahn was about the transporting official's failure to communicate to the jail personnel that Kahn had, you know, wrapped a seatbelt around her neck during the transportation. I didn't read it the way you're reading it, and perhaps I misread it, but I didn't see it as a tear-us-off warning of the family. I thought it was about notifying... It's possible. I am thinking of another case, but I thought that was Kahn. I read several of these. There was another one that I might have been thinking about, but... At any rate, our position is that all of the sum total of the evidence that was known to Officer Bryce at the time would have put a reasonable officer on notice of the fact that it violated Mr. Horton's constitutional rights to leave him alone, unattended, unwatched.
judges: Berzon, Bybee, Gleason